1      United States District Court
2           For the
       Northern District of California
3

4   Brooks Walter (Pro se)
5
6          Plantiff,
7   V. Heather Fong
    San Francisco Police Chief et al,
8          Defendant.

9                              Case No: C-07-02615 SBA(PR)
10                             MOTION TO
11                             Submitt Exibits
12                                 (D).

13     Honorable Saundra Brown Armstrong,
14  Plantiff (Walter Brooks (Pro se) Respectfully request,
    Permission of the court to submitt the Following
15  Newspaper Article, From the San Francisco Chronicle,
    Titled: Abuse of Force; By: Sandra Sward. That Appeared in
16  the Febuary 5th 2006 Edition of the Chronicle Newspaper,
    as Exibit (D) In Case # C 07 02615 SBA(PR).
17  This Article supports the Plantiffs Claims of Municiple
    Libility; Practice and Custome of Excessive Force by
18  Defendant: Jhon Haggett, Badge #16, of the San Francisco
    Police Department; as well as, the Municiple Policy of Inaction
19  by the Defendant Heather Fong Chief, San Francisco Police Dept.
20     This Article Contains A Summery of Defendant
    Jhon Haggett's History of Demonstrated and Suspected
21  Abuse of Force. Furthermoore this Article Also Contains
    A History of the San Francisco Police Departments
22  Municiple Policy of Inaction regarding Appropriatly Addressing
    The Demonstrated and Suspected abuse of Force by Defendant
23  Jhon Haggett, Badge #16, of the San Francisco Police
    Department. Wherefore, Plantiff Hereby Submitts the above
24  entitled Article as exibit (D) In Case # C 07 02615 SBA(PR).
25  Respectfully Submitted,
        Walter Brooks V23996
26  Walter Brooks V23996
        (Pro se)
27  December 13, 2007

**SFGate.com**    Print This Article    Back to Article

**SFGate.com**

# The Use of Force
## Officer John Haggett

Susan Sward, Bill Wallace and Elizabeth Fernandez
Sunday, February 5, 2006



More...



Double the score. Photo sharing with Katana II by Sanyo. Buy one, get one FREE. Online only pricing. Shop now. Sprint ahead

Elzie Byrd, a 55-year-old black man who walked with a cane, said he was crossing the street in front of the Geneva Towers apartments late on the night of Sept. 1, 1990, when a police car raced by.

He yelled, "Look out!" The car lurched to a stop, he said, then backed up rapidly toward Byrd and his companions -- his brother James and his son Clifford.

The three men hurried into the Towers, entered the elevator and pressed the button for the eighth floor, where Byrd lived. The elevator rose, then halted and returned to the lobby, apparently responding to an override button, he said.

When the elevator door opened, Byrd told the Office of Citizen Complaints, there were three police officers standing there with guns drawn. One shined a flashlight in his face and said: "You're my nigger, and I am taking your black ass to jail."

Byrd said those words were his introduction to Officer John Haggett, one of the most notorious members of the San Francisco Police Department.

The career of John Haggett is a window on a Police Department disciplinary system that time and again misses the opportunity to take problem officers off the streets.

Haggett joined the department in 1982 and in his first seven years was the subject of 56 citizen complaints. Almost half alleged brutality or unjustified arrests, according to court records. State privacy laws make it impossible to determine whether the complaints were sustained.

In that period, he was suspended twice because of beatings and threatened with firing.

But he stayed on the job.

Haggett, who did not respond to The Chronicle's written and telephoned requests for comment, has been on the force now for 23 years. After his encounter with Byrd, he was suspended a third time for another case involving unnecessary force. He also shot an unarmed man to death.

He was named in six lawsuits, none of which resulted in any finding of wrongdoing but cost city taxpayers more than $235,000 in settlements.

He also was promoted.

Not everything about Haggett's career is negative.

Putting his life on the line, Haggett has won a silver medal of valor.

He also won awards for investigating a major drug ring, a stolen-car gang and an auto burglar.

Citizen's complaint of misconduct rejected

In the Geneva Towers elevator, facing the police guns, Elzie Byrd started to pray.

Haggett responded, "Stop that f -- praying," ordered him to drop his cane, and had him handcuffed, Byrd said in an interview about the complaint he filed against the officer.

Geneva Towers, a subsidized apartment complex near the Cow Palace, was the center of one of the city's most dangerous neighborhoods. But it had been home to Byrd for 15 years. A shoeshine stand operator, he had 10 children.

Now, he said, this police officer was making him think of stories his grandparents told him when he was a small boy in East Texas -- stories of night riders calling at the blacks' homes to drag them to lynchings.

Byrd's brother James Washington, who now lives in Texas, said in a telephone interview that he, too, thought of growing up in the South as he listened to the officer threaten his brother. He said he had never heard words like that coming out of the mouth of "anyone wearing a shield."

"What I was thinking," Washington said, "was I'd been in the Air Force in Vietnam in '66 and '67 and had come here, and now I was going to get killed with my family for nothing."

Byrd said he still remembers Haggett's response at the end of their confrontation. After a police supervisor arrived and ordered Haggett to remove the handcuffs, Byrd said, he asked Haggett why he had "done this wrong to me?"

"Sue me," he quoted Haggett as telling him. "I'm not afraid of your f -- lawyers."

Byrd filed a complaint with the Office of Citizen Complaints, which under the city's charter is the only agency with power to investigate citizens' misconduct complaints about police officers.

The agency wrote Byrd that its investigation did not find sufficient evidence to sustain his complaints. It was the same response the office gives 9 out of 10 times. State privacy laws shield the office from explaining its findings.

Byrd also sued the city. He said he badly needed money and settled for $2,000.

Over the years, he said, he followed Haggett by reading "stories in the newspaper. Each time I read about what he'd done, I felt myself there."

"I am still afraid of running into him. I'm worried he might want revenge because I stood up to him

and sued."

Latino in car stop felt singled out

Two years into his career, when he was 26, Haggett made an arrest that prompted a lawsuit.

On the evening of Aug. 31, 1984, Chris Torres, a 36-year-old, long-haired deliveryman, was parking his yellow Gremlin outside his home in the Excelsior neighborhood when he saw a red police light in his rearview mirror.

It was Haggett.

Torres said the officer told him his driving was "borderline reckless" and asked for his license. In his report, Haggett stated Torres had run one red light and two stop signs.

According to Torres, Haggett ripped his license from his hand, ran a check on him, and told him there was a warrant for his arrest.

Torres told Haggett that couldn't be. Haggett then told him he was under arrest, grabbed him by the hair and throat, pulled him out of the car and choked him, Torres said.

In a deposition he gave when Torres subsequently sued, Haggett said that he never put his hands on Torres "until it came to the point that he wasn't going to do what I asked him to do" -- which was to turn around and allow himself to be handcuffed.

Haggett said he had to call for help. Torres said neighbors told him nine more police cars and 20 officers arrived. Haggett's report listed about a dozen officers.

Haggett denied ever hitting Torres, but he described a lengthy struggle and stated that to get him handcuffed, he put Torres in a headlock, "grabbing his hair with my left hand and pulling him to the ground."

The spectacle of the police dragging Torres to the ground stunned the neighborhood just off Mission Street because practically everyone on the block knew the Torres family.

Neighborhood kids often hung out at the Torres home, a neat, three-story dwelling on a quiet street. Torres said at the time he was a baseball director for the Police Activities League.

One neighbor who witnessed the incident, Marie Fernandez, said later that she concluded from the way the police behaved that Torres must have robbed a bank or killed someone.

Torres' brother, David Wharton, who had stopped by with his family to visit, yelled at police to stop, Torres said.

Haggett told other officers to arrest Wharton, Torres said, and several ran up the steps to the house with guns and batons drawn.

In the process, Torres said, an officer knocked against his sister-in-law Conchita Wharton, causing her

to drop her baby. His wife, Cathleen, managed to catch the baby before it hit the ground, Torres recalled. His 8-year-old son, Justin, was slammed against a wall. The boy was petrified, Torres said.

Torres said he ended up pleading guilty to running a red light to get the city case behind him. The traffic warrant, for which Haggett wanted to arrest him, was actually for another person, Torres said.

David Wharton was charged with threatening an officer and "accepted the charge so he could move on with his life. So he got probation for it, though he didn't do anything wrong," Torres said.

Haggett said in his report that Wharton threatened to kill him.

Torres and his family then filed a federal lawsuit against the city and Haggett.

Almost immediately after the federal trial began, the city settled, paying $35,000 to Torres.

Capt. Charles Keohane, the department's risk manager, said legal settlements can be granted by the city attorney for a variety of reasons and are not proof of officer wrongdoing.

Torres said nothing can wipe away what that incident did to his life. He remains convinced that Haggett singled him out because he was Latino and had long hair.

"I love America," Torres said, "and I believed the system would work, but it didn't" because the department allowed Haggett to remain on the streets. "They protect their own."

Attacks on teens bring suspensions

By the spring of 1987, many citizens had complained about the behavior of Haggett. Then the officer had run-ins with two teenagers that could not be ignored.

On May 30, 1987, shortly before midnight, Haggett encountered 19-year-old Jim Tahsini in the parking lot of the Safeway supermarket in Diamond Heights, where the young man worked.

When Tahsini refused to show Haggett what was in his duffel bag -- two six-packs of beer -- Haggett, he said, lunged at him and grabbed him by the throat.

Haggett threw Tahsini on the hood of his patrol car, hit him at least twice in the face with his hand, then hit him in the face with his pistol, according to department charges later filed against Haggett.

Tahsini complained to the Office of Citizen Complaints. When his case came before the Police Commission more than a year later, in July 1988, the police chief, Frank Jordan, told commissioners the allegations were "very serious" and Haggett should be fired if he misbehaved again.

The commission suspended Haggett for three months.

All charges against Tahsini, including resisting arrest and assaulting a police officer, were later dropped, and he collected $35,000 in a settlement from the city.

Four months after Haggett was suspended for pistol-whipping Tahsini, the commission sustained another complaint against Haggett in a case where he broke the nose of an 18-year-old, Matthew

O'Leary.

The charges stated that on April 11, 1987 -- six weeks before he assaulted Tahsini -- Haggett hit O'Leary twice in the face with his police walkie-talkie because the youth did not sit down fast enough when police were interviewing some people late at night on Army Street.

Chief Jordan recommended another three-month suspension, and the commission did as he recommended.

Jordan said in an interview that the O'Leary incident had already occurred when he warned Haggett about his future conduct.

"I gave a clear direction," Jordan said, "that if he had any incident showing a propensity to violence in the future, he would have been out the door."

The department's use-of-force rules spell out that officers can use only as much force as is reasonable and necessary to make an arrest, and they detail a progressive path of force from verbal persuasion through firearms.

During the Office of Citizen Complaints' investigation of Haggett's encounter with O'Leary, Haggett said what he thought of that rule.

According to department charges, he told an investigator with the Office of Citizen Complaints that he didn't know the use-of-force regulation and called it "an opinion written by people that don't work in the street anymore."

In 1990, Haggett was promoted to sergeant, a rank that made him a supervisor of other patrol officers. The department declined to comment on Haggett's promotion, citing state privacy laws covering personnel matters.

As the years went by, Tahsini said, he was called on to testify in "two or three court cases" of other people who said they were victimized by Haggett. After a while, he said, he got discouraged because Haggett stayed on the force.

"It's a joke that Haggett is still with the department," he said in an interview. "Obviously he's got a problem. What's it going to take for the department to realize it? To me, it's an old boys' club."

Violent raid at New Year's AIDS benefit

On New Year's Day 1995, Haggett committed what the Police Commission would consider his most serious offense to date. Then, 10 months later, he killed an unarmed man.

But still he managed to continue working the streets.

At 4 a.m. on New Year's Day, Haggett was one of the officers who raided an AIDS benefit where hundreds of guests had convened in a vast Harrison Street warehouse. Police said they conducted the raid because the party did not have the proper permits.

Charges eventually were dropped against the 11 people arrested on allegations ranging from resisting arrest to failure to have a proper permit.

When partygoers sued, their lawyer, Nanci Clarence, said, "Haggett was involved in some of the most brutal attacks against the benefit guests, including choking a man from behind until he almost passed out."

In October 1996, the Police Commission found Haggett had committed four offenses that could warrant dismissal -- using unnecessary force on one person and falsely arresting three people.

Despite the multiple offenses and the fact that he had been warned that he would be fired if he ever engaged in misconduct again, the commission chose a lesser punishment recommended by Police Chief Fred Lau.

It suspended Haggett for six months and told him he would be fired if he committed further violations during a three-year probationary period.

Frank Jordan, the chief who threatened Haggett with dismissal in 1988, said in an interview that the treatment of Haggett's conduct in the 1995 raid suggested a flaw in the commission's approach.

"It seems that if he were guilty as charged, they should have taken into account my previous warning," Jordan said. "The commission should be looking back at officers' previous records."

Chief Lau said at the time that the raid represented a total breakdown in department procedures and that Haggett should not be singled out for firing.

The commission's president, John Keker, a prominent lawyer, said at the same time that problems with the department's command and control structure "should not be laid at the door of Sgt. Haggett."

The commission's action outraged members of the gay and lesbian community and critics of the department's disciplinary system.

Lester Olmstead-Rose, the director of Community United Against Violence, said in an interview the day after the commission's decision: "I think the question is, what on Earth does it take to get fired by the San Francisco Police Department?"

The city eventually paid almost $150,000 to settle the suit filed against Haggett and others during the raid.

Lau said in a recent interview that state privacy laws covering personnel matters barred him from discussing the matter.

Unarmed man shot dead after chase

While the AIDS raid case was pending, Haggett shot and killed a man.

Nov. 1, 1995, was a hot day in the Tenderloin. Haggett wore a Hawaiian shirt and jeans with his police star on a chain around his neck as he hunted for wanted suspects with other officers.

Interviewing some parolees, he suddenly heard what he described later as "a bomblike explosion."

A van had collided with a produce truck. Haggett and some other officers jumped in an unmarked car and gave chase as the van careered down Hyde Street.

Haggett would later state that the driver "must have known the police were chasing him, but he did not heed our siren. In my experience, people who behave this irrationally are usually on drugs."

Eventually, the van was blocked by traffic, and Haggett confronted the driver.

The man had "a hard street look not uncommon in the Tenderloin, and he was wild-eyed," Haggett declared. "I thought to myself, 'This man is crazy.' "

The driver, wearing a black leather jacket and jeans, made a quick movement that made Haggett think he "was about to shoot me." Haggett shot him twice.

Haggett told homicide inspectors that he didn't see a gun before he fired his semiautomatic pistol, and no weapon was found.

The dead man was Edwin Sheehan, a 40-year-old parolee with a long drug-associated criminal record. The medical examiner's autopsy found cocaine and methamphetamine in his blood.

Marina Sarmiento, a lawyer, saw the shooting and thought it unwarranted.

"I was shocked that the suspect had been shot as the suspect did not have a weapon," she wrote to the Office of Citizen Complaints the next day.

"I could see both of the suspect's hands, and at no time did it appear as if he were reaching for a weapon."

"I felt that the police used excessive and deadly force in restraining a suspect who had no weapon and no clear avenue of escape," she wrote.

Homicide inspectors investigating the killing spoke with Sarmiento and obtained her letter. But their report gives no indication that she thought anything she saw was amiss.

Sarmiento declined to be interviewed for this story.

Two days after Sheehan's death, homicide inspector Richard Adkins told a news conference that Haggett "apparently felt his life and the lives of other citizens in the area were endangered, and he felt it was necessary to shoot."

Initially, John Burris, an Oakland lawyer who specializes in cases alleging civil rights violations by police, agreed to represent Sheehan's widow, Leslie. But then he decided to withdraw.

"I still thought it was a bad shooting," Burris said, "but I made a legal decision we couldn't prevail. Jurors don't want to believe police would take someone's life without just cause, and if the victim is not sympathetic, the jurors won't go."

Leslie Sheehan then tried to act as her own attorney, but her wrongful death lawsuit against Haggett and the city was dismissed. In her suit, she argued that Haggett was "lying to cover up a deliberate, cold-blooded killing."

Ken Quigley, a longtime lawyer for both Sheehan and his wife and a veteran of several cases involving Haggett, said that in Haggett's eyes, "anyone he met on the streets of the Tenderloin, like Eddie Sheehan that day, would be someone he'd consider to be a waste of oxygen."

Citizens question aggressive tactics

In the years after the Sheehan shooting, there were other controversial cases involving Haggett, including two with allegations that resulted in sustained complaints against him by the Office of Citizen Complaints.

In the first incident, which occurred in the summer of 1999, the office sustained a complaint against Haggett for invasion of privacy -- for reading aloud an arrested man's rap sheet of minor crimes in the Taraval Station lobby, where his wife and several friends had come to try to win his release.

In the second case, in December 1999, Haggett ordered two officers to search a house in the Parkside neighborhood for a parolee.

Without a warrant, he accompanied the officers and used racial slurs when dealing with the home's occupants, the Office of Citizen Complaints stated.

The officers got in by kicking down one door and taking another off its hinges, the dwelling's tenant, Rodrigo Ruiz, told The Chronicle.

Ruiz said that when he objected that the search was illegal, Haggett told him: "I don't need no f -- warrant. I'm the f -- police."

After Ruiz filed a complaint with the Office of Citizen Complaints, that office sustained charges of illegal search and ethnic slurs and forwarded them to Chief Fred Lau no earlier than May 31, 2001, according to a document filed later by Haggett's attorney, James Lassart.

According to the office's finding, Ruiz and another man in the home during the search said Haggett told them, "Look at those f -- tennis shoes you have on. The last time I saw shoes like that was on a f -- nigger in the projects."

They said he also used the word "spic" when talking to them, the finding stated.

After Lau received the charges, the department did not file formal charges with the Police Commission until mid-July.

Haggett blocked potential commission discipline by going to court and arguing that the department filed its charges after the one-year statute of limitations set by the Public Safety Officers Procedural Bill of Rights.

Officer said to retaliate when questioned

Ruiz's case was one of several where citizens got in trouble with Haggett when they questioned the police's right to do what they were doing.

Ray Pellegrini, a former Olympic Club and city golf champion, stated in a lawsuit that he went to Taraval Station on Oct. 20, 2000, and announced in Haggett's presence that he intended to file a complaint against two other officers he felt had mistreated him in an earlier incident.

In response, Pellegrini said in the suit, Haggett grabbed him, handcuffed him and had him jailed overnight for threatening a peace officer, a felony.

Pellegrini stated in the suit that Haggett did this to him despite knowing Pellegrini "was within his rights as a citizen" to register a complaint about the conduct of the two other officers. The lawsuit stated that all charges against Pellegrini had been dismissed. He settled his case against the city for $13,000.

Louise Vaughn, a community newspaper reporter, said her disturbing experience with Haggett occurred when she criticized the officer for chasing down several young black men who had cursed him in the Bayview district.

It was on a tense night in 1992, just after a Los Angeles jury acquitted four officers in the beating of motorist Rodney King, she said.

Vaughn said she told Haggett that, considering the tensions, he should back off. Haggett arrested her for interfering with a police officer, she said. She added that the charge was later dismissed.

Vaughn said he told her, "This is my community." She added, "He was saying he could do what he wanted to do."

The Office of Citizen Complaints found that Haggett had retaliated against her, according to John Crew, a lawyer who at the time was police practices expert for the American Civil Liberties Union of Northern California. The chief at the time, Tony Ribera, decided the offense merited only counseling, Crew said in 1995.

Officer also shows compassionate side

While Haggett was building his record of suspensions and citizen complaints, he regularly engaged in conduct that also won him commendations.

On April 12, 1995, several months before Haggett killed Edwin Sheehan, the Police Commission awarded Haggett a silver medal of valor. The department's second-highest award was for his bravery in apprehending and disarming a man with a 9mm automatic on Oct. 7, 1992.

Haggett was off duty, driving in his personal car with his wife. He glanced at the car next to him and saw a man with a pistol in his hand. He followed the car and eventually confronted the two occupants, arresting both and seizing the gun after a tense standoff.

The man with the gun turned out to be a parolee, and the gun had been stolen in a recent burglary.

Sometimes Haggett exhibited a compassionate side.

Robert Waggener, a defense lawyer, encountered Haggett in the spring of 1999 when he represented a youth who used his mother's car as the getaway vehicle in a pizza restaurant holdup where the weapon was a BB gun. The youth was scheduled to graduate within a week from Lowell High School.

"The case needed more investigating," Waggener said.

"Haggett knew the boy wasn't going anywhere, so he decided to release him. He could have kept the boy in custody, and he would have missed his graduation.

"I gained a lot of respect for him," Waggener said. "Haggett has a reputation as a cowboy, but there is another side to him. He can be a good cop."

The youth was eventually given a sentence that involved at-home monitoring, and he went on to graduate from college, Waggener said.

Witness calls officer 'a ticking time bomb'

Today, Haggett lives with his wife in a cul-de-sac home on a hillside south of San Francisco and works as a sergeant in the Southern Station at Seventh and Bryant streets.

Police Chief Heather Fong said the discipline meted out to Haggett in the past was imposed by the police commission.

She noted that officers who have been disciplined and are no longer suspended "are allowed to continue to be members of the department and are expected to abide by the rules and procedures of the department."

The Geneva Towers complex, where Byrd faced Haggett and his drawn service revolver, was torn down in 1998. Not long ago, Byrd retired from the shoe repair business. He has never run into Haggett again, he said, but his memory of the officer is vivid.

"Here was a man who has shown his hate -- for blacks and whites," Byrd said. "No police department in America needs a ticking time bomb like John Haggett."

*Chronicle researcher Lois Jermyn contributed to this report.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2006/02/05/MNUFHAGGETT.DTL

This article appeared on page **A - 10** of the San Francisco Chronicle

San Francisco Chronicle Sections [Go]

© 2006 Hearst Communications Inc. | Privacy Policy | Feedback | RSS Feeds | FAQ | Site Index | Contact